## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

_____

|  |  |
|---|---|
| PLUMBERS AND PIPEFITTERS NATIONAL PENSION FUND, UNITED ASSOCIATION GENERAL OFFICERS PENSION PLAN, UNITED ASSOCIATION OFFICE EMPLOYEES PENSION PLAN, UNITED ASSOCIATION LOCAL UNION OFFICERS & EMPLOYEES PENSION FUND, TEACHERS' RETIREMENT SYSTEM OF LOUISIANA, LOUISIANA STATE EMPLOYEES' RETIREMENT SYSTEM, and VOYAGEUR ASSET MANAGEMENT ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. _____<br><br>Related to MDL<br>Docket No. 02-1335-PB |
| Plaintiffs ) ) ) | |
| v. ) ) ) | |
| TYCO INTERNATIONAL, LTD. ) ) ) | |
| Defendant ) ) | |

_____

### COMPLAINT FOR INJUNCTIVE, EQUITABLE AND DECLARATORY RELIEF

Plaintiffs, by their attorneys, and (a) in their capacity as representatives of the class that they seek to represent ("Class") in the related consolidated securities class action litigation currently pending before this Court styled as: *In re Tyco International, Ltd., Securities Litigation,* MDL Docket No. 02-1335-PB (the "Securities Action"), and (b) pursuant to their responsibilities to the Class in that action, make the following allegations against defendant Tyco International, Ltd. ("Tyco" or the "Company") in support of their Complaint upon information and belief (except as to allegations specifically pertaining to Plaintiffs and their counsel, which are based on personal knowledge).  Plaintiffs' allegations are based upon the thorough

investigation conducted by and under the supervision of Plaintiffs' counsel in the Securities

Action and the analysis of information obtained in the course of prosecuting the Securities

Action, as well as the review and analysis of publicly disseminated information and financial

data relating to Tyco's January 13, 2006 announcement that its Board of Directors has approved

a plan to split the Company into three separate, publicly traded companies – Tyco Healthcare,

Tyco Electronics, and the combination of Tyco Fire & Security and Engineered Products &

Services (the "Split Up Plan").

Except as alleged herein, the underlying information relating to the Split Up Plan and the

particulars thereof is not available to Plaintiffs and the public and lies exclusively within the

possession and control of defendant Tyco and other insiders, thus preventing Plaintiffs from

further detailing the misconduct alleged herein.  Plaintiffs believe that further substantial

evidentiary support will exist for the allegations set forth below after a reasonable opportunity

for discovery.

## I.    NATURE OF THE ACTION

1.    This action arises out of: (i) the recent announcement by Tyco that its Board of

Directors has approved, and that it intends to effect, a major corporate reorganization whereby it

will split up into three separate, publicly traded companies; and (ii) Tyco's refusal to structure

the transaction to provide for joint and several liability among the resulting separate entities, or

to provide Plaintiffs with any other appropriate assurance(s) that the Split Up Plan will not

frustrate Plaintiffs' ability to satisfy an award of damages in the Securities Action.  As set forth

herein, Plaintiffs assert claims for fraudulent conveyance and unjust enrichment, and seek

narrowly tailored injunctive and other equitable relief to preserve rights of aggrieved investors to

attach or execute on the assets of Tyco in order to satisfy such an award or judgment.

## II.    JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1332 because there is complete diversity of citizenship among the parties, and the

amount in controversy exceeds $75,000, exclusive of interest and costs.  In addition, both the

Securities Act of 1933 [15 U.S.C. § 77v] and the Securities Exchange Act of 1934 [15 U.S.C.

§ 78aa] confer broad remedial powers upon the United States District Courts.  Accordingly, this

court has the authority to grant ancillary relief (including equitable relief) when necessary to

(a) effectuate the purpose of the securities laws, (b) ensure that victims of securities fraud can

obtain complete relief for any losses that have suffered or incurred on account of wrongful

conduct; and (c) prevent the judicial process from being rendered futile by the conduct of a

securities fraud defendant.

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because Tyco

resides in this district and a substantial part of the events or omissions giving rise to the claims

alleged herein occurred, and/or a substantial part of property that is the subject of the action is

situated, in this district.

## III.    PARTIES

### A.    PLAINTIFFS

4.      Plaintiffs Plumbers and Pipefitters National Pension Fund, United Association

General Officers Pension Plan, United Association Office Employees Pension Plan and United

Association Local Union Officers & Employees Pension Fund, Teachers' Retirement System of

Louisiana, Louisiana State Employees' Retirement System, and Voyageur Asset Management

("Lead Plaintiffs") were appointed lead plaintiffs in the Securities Action pursuant to the Private

Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4, *et seq* (the "PSLRA") and an Order

of this Court dated November 20, 2002. In the Securities Action, Lead Plaintiffs seek to

represent investors who purchased the securities of Tyco at artificially inflated prices between

December 13, 1999 and June 7, 2002 (the "Class Period"), and were damaged when the truth

regarding a fraudulent scheme and course of conduct employed by Tyco's senior management

was revealed to the market and Tyco's stock price dropped tremendously. Plaintiffs bring this

action in their capacity as Class representatives in the Securities Action and pursuant to their

responsibilities to the Class in that case.

      5.      Plaintiff Plumbers and Pipefitters National Pension Fund is a citizen of the state

of Virginia. Plaintiff United Association General Officers Pension Plan is a citizen of the state

of Virginia. Plaintiff United Association Office Employees Pension Plan is a citizen of the state

of Virginia. Plaintiff United Association Local Union Officers & Employees Pension Fund is a

citizen of the state of Virginia. Plaintiff Teachers' Retirement System of Louisiana is a citizen of

the state of Louisiana. Plaintiff Louisiana State Employees' Retirement System is a citizen of

the state of Louisiana. Plaintiff Voyageur Asset Management is a citizen of the state of

Minnesota.

      **B.**      **DEFENDANT**

      6.      Defendant Tyco is a Bermuda corporation with corporate offices in Portsmouth,

New Hampshire, which holds itself out as a diversified manufacturing and services company.

**IV.**      **FACTS GIVING RISE TO COMPLAINT**

      **A.**      **TYCO'S CLEARLY ESTABLISHED WRONGDOING**

            **1.**      **The Securities Action**

      7.      The Securities Action involves one of the single largest accounting frauds in

American corporate history. As set forth in the Consolidated Securities Class Action Complaint,

dated January 28, 2003 (the "Securities Complaint"), Plaintiffs allege that Tyco and the various

defendants in the Securities Action perpetrated a massive fraud involving accounting

manipulations and looting of the Company that resulted in Tyco's overstating its pre-tax income

during the Class Period by billions of dollars.

8.      Among other things, the Securities Complaint alleges that Tyco: (i) falsely

claimed that its growth was organic and the result of superior management; (ii) falsely claimed

that its management was of the highest integrity; (iii) falsely claimed that its accounting was

appropriate and conservative; (iv) failed to disclose the individual defendants' looting of the

Company's assets; and (v) failed to disclose its fraudulent accounting practices.

9.      As described by this Court in its October 14, 2004 Order denying in large part

Tyco's and the other Securities Action defendants' motions to dismiss: "[i]n essence, plaintiffs

charge that Tyco's senior management operated the company as a criminal enterprise in which

fraudulent accounting practices were used to generate cash to fund Tyco's acquisition strategy.

The looting, in turn, occurred both to benefit the individual defendants and to create incentives to

continue with the accounting fraud." *In re Tyco Int'l, Ltd*., Nos. MDL 02-1335-PB, 02-266-PB,

2004 WL 2348315, at *14 (D.N.H. Oct. 14, 2004) (holding that the Securities Complaint

satisfied the stringent pleading standards imposed by the PSLRA and pleaded violations of the

Securities Act of 1933 and the Securities Exchange Act of 1934 against Tyco (and various of its

officers and directors)).

10.     In reliance upon publicly reported financial information and other

pronouncements by Tyco, investors purchased billions of dollars' worth of Tyco securities.

Ultimately, as the fraud was revealed to the market, Tyco's stock price declined from $58.90 on

December 31, 2001 to $10.10 on June 7, 2002, a drop of $48.80 per share, or 82.9%, causing investors to lose billions in market value.

11.    Thus, even conservative estimates of the damages suffered by class members in the Securities Action are in the ***billions of dollars***.

12.    By restating its Class Period financial statements and wiping out billions of previously reported pre-tax income, Tyco has admitted that its Class Period financial statements were materially false.  Accounting Principles Board Opinion No. 20, Accounting Changes ¶¶ 18, 27, 34-38 (July 1971).

13.    Additionally, since hiring the law firm Boies, Schiller & Flexner, LLP ("Boies Schiller") to conduct an investigation in 2002, Tyco has made numerous admissions of actionable misconduct, including without limitation that:

- "there were instances where prior management appeared to influence the management of an acquisition target into adopting accounting treatments that 'over-accrued' expenses prior to an acquisition's consummation or otherwise exceeded what was permitted by GAAP."  Form 8-K filed with the SEC on December 30, 2002 ("December Boies Report");

- "in a number of instances the accounting treatment applied to certain transactions in the Company's reported financials was erroneous."  December Boies Report at 7;

- "[t]he Company in general took aggressive approaches in its accounting, including its acquisition accounting, the classification of charges and expenses as non-recurring, amortization and depreciation decisions, recognition of revenue, and capitalization of expenses."  December Boies Report at 32-33.

- Tyco's internal controls were inadequate (*see, e.g.*, Securities Complaint at ¶¶155-164 (citing December Boies Report and Tyco's Form 10-K dated December 30, 2002)); and

- Tyco's senior officials looted the Company (*see, e.g.,* Securities Complaint at ¶¶183-248; Form 8-K filed with the SEC on September 10, 2002 ("September Boies Report") at 4-7, 10-11, 13-20, 27-28, 30-36; December Boies Report at 8).

2.      **The Criminal Convictions Of Kozlowski And Swartz**

14.      On June 17, 2005, a jury convicted Tyco's former CEO J. Dennis Kozlowski ("Kozlowski") and Mark Swartz ("Swartz") of twenty-two counts of first-degree grand larceny, falsification of business records, conspiracy, and violation of New York Gen. Bus. Law § 352-c(5) (the "Martin Act").  *People of the State of New York v. L. Dennis Kozlowski and Mark H. Swartz,* Ind. No. 5259/2002.  Kozlowski and Swartz were subsequently sentenced to serve a term of up to 25 years in state prison and ordered to pay several hundred million dollars in restitution and fines.

15.      Among other things, Kozlowski and Swartz were convicted of making false representations and material omissions (in SEC filings and elsewhere) related *inter alia* to executive compensation and loans, stock sales by corporate insiders, Tyco's earnings per share, related-party transactions, and the artificial inflation of certain measures of earnings per share. Kozlowski and Swartz were also found to have caused misleading information to be included in Tyco's financial statements.

16.      Both the criminal indictment under which Kozlowski and Swartz were convicted and the Securities Complaint describe a scheme to obtain money and securities through false pretenses and misrepresentations, identify numerous acts of "looting," including the granting of bonuses, forgiveness of loans, and vestings of restricted stock, and identify a number of business records that were falsified in furtherance of Kozlowski's and Swartz's scheme.

3.      **Resulting Governmental Proceedings
Against Tyco And Other Defendants**

17.      On or about August 13, 2003, the U.S. Securities and Exchange Commission ("SEC" or "Commission") instituted public administrative and cease-and-desist proceedings pursuant to Section 21C of the Exchange Act and Rule 102(e) of the Commission's Rules of

Practice against Richard P. Scalzo, PricewaterhouseCoopers LLP's ("PwC") engagement partner

for the audits of Tyco's financial statements for fiscal years 1997 through 2001. *See In re*

*Scalzo,* S.E.C. Release No. 48328, August 13, 2003 ("Scalzo Order").

18.    In the Scalzo Order, in the course of finding that "PwC, under Scalzo's direction,

for each of Tyco's fiscal years ended September 30, 1998; September 30, 1999; September 30,

2000; and September 30, 2001, failed to conduct an audit of Tyco's financial statements in

accordance with GAAS [Generally Accepted Auditing Principles]" the SEC specifically noted

that:

- PwC's audit work papers for its audits of Tyco's financial statements for the fiscal years ended September 30, 1998 through September 30, 2001 contained documents which "showed that [Tyco] was using the KELP [Key Employee Loan Program] for the improper benefit of its most senior officers, and, in any event, for purposes other than the only purpose stated in the notes to the company's financial statements -- the payment of taxes on the vesting of restricted stock." Scalzo Order Section D(1)(a);

- Tyco refused to disclose in its periodic reports non-interest-bearing "relocation" loans granted to Tyco executives and that "[b]y the time of the fiscal year 1999 audit. . .Kozlowski had $35.5 million, and that Swartz had $8 million, of such loans." Scalzo Order Section D(1)(b);

- in "[t]wo separate incidents, and one ongoing practice," Tyco's management "utilized post-period adjustments to negate the impact of unanticipated charges." Scalzo Order Section D(1)(c)

- "Scalzo continued to witness Tyco's use of general unallocated reserves to off-set unexpected expenses throughout Tyco's fiscal years 1998-2001. Scalzo Order Section D(1)(d); and

- the company "aggressively attempt[ed] to classify executive bonuses in a manner that would keep the bonuses out of Tyco's operating expenses" in connection with the TyCom IPO, the ADT Automotive Divestiture and the The FLAG Telecom Transaction. Scalzo Order D(1)(e);

19.    On October 23, 2002, Tyco entered into a Consent Agreement with the State of

New Hampshire's Bureau of Securities Regulation (the "Bureau"). Based on the same acts of

corporate fraud and looting that are alleged in the Securities Action, the Bureau concluded that

Kozlowski, Swartz, Tyco's former general counsel Mark Belnick ("Belnick") and former Tyco director Frank E. Walsh, Jr. ("Walsh") "engaged in egregious, self-serving and clandestine misconduct that they concealed from Tyco's shareholders, Tyco's regulators, and Tyco's other Board members and oversight committees." As part of the Consent Agreement, Tyco stated that it would not "take any action or make or permit to be made any public statement, including in regulatory filings or otherwise, to create the impression that the consent agreement is without factual basis." Consent Agreement, *In re Tyco Int'l Ltd.*, INV 02-024 (N.H. Bureau of Sec. Regulation, Oct. 23, 2002), at 3, 8.

20.    In its October 14, 2004 Order, this Court recognized that Tyco could be held liable for the actions of Kozlowski and Swartz. *In re Tyco Int'l, Ltd.*, 2004 WL 2348315 at *5-6 (holding that "the adverse interest exception is inapplicable when a corporate officer or director makes a material misstatement or omission to an innocent third-party while acting with the apparent authority of the corporation for whom he works.").

21.    Based on the foregoing facts, and upon numerous documents identified by Plaintiffs in discovery in the Securities Action: (i) there is a high probability that Tyco's liability under the Federal Securities laws, to the extent not already admitted, will be provable at trial and that no significant defenses to such liability are available to Tyco and (ii) the measure of recoverable damages suffered by the Class **will be in the billions of dollars.**

**B.    TYCO ANNOUNCES THE PROPOSED "SPLIT UP PLAN"**

22.    On the morning of January 13, 2006, the Company announced that a plan to split up Tyco had been approved by the Company's Board of Directors. In that regard, the Company issued a press release (the "Press Release") stating, among other things, that:

> Tyco International Ltd. (NYSE:TYC; BSX:TYC) today announced that its Board of Directors has approved a plan to separate the company's current portfolio of

diverse businesses into three separate, publicly traded companies – Tyco Healthcare, one of the world's leading diversified healthcare companies; Tyco Electronics, the world's largest passive electronic components manufacturer, and the combination of Tyco Fire & Security and Engineered Products & Services (TFS/TEPS), a global business with leading positions in residential and commercial security, fire protection and industrial products and services.

The company intends to accomplish the separation through tax-free stock dividends to Tyco shareholders, after which they will own 100% of the equity in three publicly traded companies. Each company will have its own independent Board of Directors and strong corporate governance standards. Tyco expects to complete the transactions during the first quarter of calendar 2007.

*                    *                    *

Tyco's Board of Directors and senior leadership have evaluated a broad range of strategic alternatives, including continuation of Tyco's current operating strategy, sales of select businesses, and separation of only one of the businesses. The company and Board concluded that separating into three businesses is the best way to position these market-leading companies for sustained growth and value creation.

**Three Leading Global Companies**

*TYCO HEALTHCARE*
*                    *                    *
This proposed separation will create a leading stand-alone healthcare company, which is expected to benefit from a focused and independent healthcare culture to help attract top industry talent and strategic partners, as well as increasing access to emerging healthcare-related technologies. This business will continue to be led by current Tyco Healthcare President Rich Meelia, who will become the company's Chief Executive Officer. Chief Operating Officer Kevin Gould and Chief Financial Officer Chuck Dockendorff will also continue in their current leadership positions with the company.

*TYCO ELECTRONICS*

*                    *                    *

As a $12 billion stand-alone enterprise, Tyco Electronics will be positioned to move quickly and strategically as competition requires, and will be better able to participate in ongoing electronics industry consolidation. The company's Chief Executive Officer will be Tom Lynch -- current President of Tyco's Engineered Products & Services segment -- who brings broad experience in the communications and electronics industries. Dr. Juergen Gromer, who has led Tyco Electronics since 1999, will continue as President, and will also assume

additional responsibilities as Vice Chairman.  Jacki Heisse will continue to serve as the company's Chief Financial Officer.

### TYCO FIRE & SECURITY/ENGINEERED PRODUCTS & SERVICES

TFS/TEPS will be led by Tyco International Chairman and CEO Ed Breen as well as Tyco International's Chief Financial Officer, Chris Coughlin.  TFS/TEPS is an $18 billion world leader in electronic security solutions for residential, business, and governmental customers, fire protection and sprinkler systems, and industrial valves and controls. With more than 118,000 employees, TFS/TEPS has a large, stable recurring revenue base and generates strong cash flow.  Dave Robinson will continue to serve as President of Tyco Fire & Security.  Naren Gursahaney will succeed Tom Lynch as President of Engineered Products & Services.

Breen added, "We believe this separation is a logical next step in Tyco's evolution and we are absolutely convinced that this is the right decision for the long-term success of our businesses, employees and shareholders."

23.    The Press Release was virtually silent regarding the allocation of Tyco's debts

and liabilities under the proposed transaction.  The Press Release noted only the following:

It is anticipated that all three companies will be capitalized to provide financial flexibility to take advantage of future growth opportunities.  They are expected to have financial policies, balance sheets and credit metrics that are commensurate with solid investment grade credit ratings.  Tyco will continue to follow financial policies that are consistent with its current credit ratings until the planned transactions take place. *The company's existing debt is expected to be allocated among the three companies or refinanced.  Any existing or potential liabilities that cannot be associated with a particular entity will be allocated appropriately to each of the businesses, and a sharing arrangement among the three companies will be established.*

(emphasis added).  Outside of the cryptic mention of appropriate "allocations" and a conclusory

reference to a "sharing arrangement," no further information regarding the distribution of

existing debt and/or potential liabilities was provided by the Company.

24.    On January 13, 2006, counsel for Tyco in the Securities Action filed a copy of the

Press Release with the Court.  In its court filing, which was titled "Notice of Press Release by

Tyco International, Ltd.," Tyco specifically referenced the statement in the Press Release to the

effect  that "[a]ny existing or potential liabilities that cannot be associated with a particular entity

will be allocated appropriately to each of the businesses, and a sharing agreement among the three companies will be established." Tyco did not at that time (or subsequent to January 13, 2006) provide the Court with any further (or more specific) information regarding the "appropriate[]" allocation or the so-called "sharing agreement."

25.     The net result of the proposed Split Up Plan is that instead of one company (Tyco), there would now be three separate (and independent) companies as follows: (a) Tyco Healthcare; (b) Tyco Electronics; and (c) Tyco Fire & Security/Engineered Products & Services.

26.     Even before Tyco's formal announcement, news reports were published expressing analysts' skepticism and criticism of such a reorganization. For instance, a January 11, 2005, *BusinessWeek Online* posted an article titled "Tyco: The Case Against a Breakup" (the "*Business Week Online* article"), noted that "a fierce debate" had emerged among analysts regarding the reported split of Tyco – with many such analysts "deeply skeptical" of the viability of the Company's proposed plan. In this regard, the *BusinessWeek Online* article referenced, among other issues, the likelihood of a substantial payout to shareholders in the ongoing Securities Action:

> "Tyco still faces a daunting legacy issue from [the Kozlowski] era: the lawsuits filed by shareholders who lost billions due to the plunge in the share price during Koslowski's last months in office. While Tyco is working to settle those lawsuits, 'It's likely [Tyco] will have to pay a multibillion [dollar] settlement to do so,' warns [one analyst]. And that's a liability that Tyco will face regardless of whether it breaks up or not."

27.     The *Business Week* article also noted that the proposed Split Up Plan would result in the Company "shedding" its two most profitable operating units:

> . . . *credit analysts are already warning that a breakup would be bad news for holders of Tyco's huge debt*. . . .

Under the reported plan, Tyco would be shedding its two most profitable units. The brightest star is Healthcare, which posted operating earnings of $2.3 billion on sales of $9.5 billion in the fiscal year ended Sept. 30 -- equivalent to a margin of 24%

. . . The second unit tagged for spin-off is Tyco Electronics, which earned $1.9 billion on sales of $12 billion -- equal to a 15% margin.  That would leave Tyco with the two weakest units: fire and security and engineered products and services, both of which posted an operating margin of about 10% last year.

Before Tyco could proceed with a spin-off, it would have to overcome many obstacles.  One of the most important would be how to handle the nearly $15 billion of total debt on its balance sheet. . . .That debt is currently held by the parent company.

***The biggest concern for credit analysts is that Tyco might spin off health care and electronics -- and the massive cash flow those businesses generate -- while retaining much of this debt***. 'That would be a real negative for credit quality,' warns Joel Levington, a credit analyst at Standard & Poor's Ratings Services (like BW Online, a unit of The McGraw-Hill Companies), which has had Tyco on 'negative' watch ever since Breen started talking about a potential breakup in November [2005]. (emphasis supplied).

28.    On the morning of January 13, 2006, the Company conducted a conference call for analysts to discuss the proposed Split Up Plan.  In the course of his opening remarks during that conference call, Edward Breen, Tyco's Chief Executive Officer, said that the Company was "confident" in its ability to resolve the shareholder litigation "in due course."  In his opening remarks, Tyco Chief Financial Officer, Chris Coughlin, stated that with respect to what he termed non-identifiable liabilities (such as shareholder litigation):

From a liability perspective, each entity will continue to be responsible for its own obligations related to normal operating activities.  ***For any existing and potential liabilities that are not identifiable with a particular entity, such as the shareholder litigation, they will be allocated appropriately to each of the businesses and a sharing arrangement amongst the three companies will be established***. (emphasis added)

29.    On the following day, an article entitled "Tyco Details Plan To Split in Three; Its Shares Tumble" appeared at *The Wall Street Journal Online* which focused, *inter alia*, upon the

Company's ambiguous public disclosure regarding how the potential liability pertaining to the

Securities Action would be apportioned following the Split Up Plan.  In relevant part, this article

stated:

> Tyco provided few answers to questions about how its liabilities will be apportioned in the spinoff.  ***The liabilities include $12.6 billion in debt and a large potential payout to shareholders suing over the company's past mishaps --*** also legacies from the days of Mr. Kozlowski.
>
> The convictions of Mr. Kozlowski and his No. 2, Mark H. Swartz, have likely bolstered the plaintiffs' chances for success in those suits. . . .
>
> *                    *                    *
>
> Tyco spokeswoman Sheri Woodruff said that ***the company would allocate the debt 'as it makes sense' among the three successor companies, but that exactly how it would be apportioned hasn't yet been decided. "We're going to set these companies up so that they have very strong balance sheets***," she said. (emphasis added).

**C.    THE EFFECT OF THE PROPOSED "SPLIT UP PLAN" ON THE CLASS**

30.    As noted above (*see supra* at ¶¶ 7-21), there exists a substantial probability that

Tyco's liability for violations under the federal securities laws has, or will be established in the

Securities Action and that the recoverable measure of damages suffered by the Class in the

Securities Action on account of the pervasive fraud that was engaged in by Tyco during the Class

Period will be in the ***billions of dollars***.

31.    The ability of Tyco to satisfy this liability, even from ***all*** of its assets is far from

assured.  For example, a January 18, 2006, *Wall Street Journal* article entitled "Investors Grow

Sour on Tyco Breakup, Fearing Financial Dismay, Not Magic," noted that:

> Breakup plans force investors to get real about the hidden value they are trying to unlock.  ***In these two cases, there isn't much.  At the end of its fiscal year, Tyco's book value (assets minus liabilities) was $32 billion.  Much of its assets were airy accounting constructions: $25 billion was goodwill (money spent on acquisitions above the hard assets purchased) and $5 billion was other***

*"intangible assets."* Cendant, for its part, has $11 billion in book value -- with goodwill assets valued at $12 billion. (emphasis added).

32.     Prior to January 13, 2006, it was clear that any recovery obtained by the Class in this regard could be satisfied by resort to the entirety of Tyco's assets.  However, the decision by Tyco's Board to split the Company into three pieces, as well as the Company's evasive and cryptic disclosures as to how liabilities from the Securities Action  will be divided between and among the companies that will result from the split and the Company's refusal to provide for joint and several liability or to provide Plaintiffs with any other reasonable assurances, irreparably harms the Class by rendering a damage remedy inadequate.  More specifically, in the absence of an appropriate agreement, undertaking or other assurance that the Class' right of recovery is not to be materially altered or obstructed by the proposed split of Tyco into three distinct and independent entities (as, for example, through a provision that the three companies are jointly and severally liable for any liability in the Securities Action), the proposed distribution of Tyco's assets in connection with the Split Up Plan will delay – and perhaps defeat – the Class' ability to recover.

33.     Joint and several liability among the three Tyco entities would preserve the Class' rights as they existed prior to January 13, 2006 (by permitting the Class to satisfy the whole amount of any judgment obtained in the Securities Action against the assets of any and all of the resulting companies – irrespective of contribution(s) among the entities themselves).

**D.    PLAINTIFFS' EFFORTS TO SECURE REASONABLE ASSURANCES FROM TYCO**

34.    Upon learning of the proposed Split Up Plan, counsel for Plaintiffs immediately delivered a letter to Tyco's attorney on January 12, 2006 seeking additional information regarding the proposed transaction.  That letter stated, in relevant part, that:

> We understand, based upon a variety of news reports, that Tyco's board is in the process of approving a plan to break the company into three parts by splitting off the healthcare and electronics segments in tax-free transactions.  As counsel for the securities class, with claims against Tyco that exceed many billions of dollars, we are gravely concerned that this transaction will improperly and unlawfully interfere with Tyco's ability to satisfy this obligation.  *We request an immediate and detailed explanation as to how you propose to protect our clients' claims, as well as information regarding the structure and proposed timing of the planned transaction.  Absent a satisfactory explanation, we will have no choice but to seek intervention of the Court.*

(emphasis added).

35.    Several days later, counsel for Plaintiffs and Tyco conducted a conference call during which counsel for Plaintiffs requested that Tyco structure the Split Up Plan to provide for joint and several liability (for any damages awarded in the Securities Action) among the separate companies which emerge from the Split Up Plan.

36.    On January 23, 2006, counsel for Plaintiffs again wrote to counsel for Tyco and reiterated Plaintiffs' position that any plan to Split Up Plan the Company implemented by Tyco should provide for joint and several liability among the separate entities which emerge from the Split Up Plan and that any other allocation of liability would be unacceptable.

37.    Finally, on January 26, 2006, Tyco's counsel sent a letter to Plaintiffs counsel in which Tyco flatly rejected providing to plaintiffs the ability to satisfy their claims from all of Tyco's assets.  In that letter, Tyco's counsel asserted that (a) "it is contemplated that" the companies which emerge from the Split Up Plan will enter into an "arrangement for proportionate sharing of any liability" and (b) a joint and several liability arrangement among the

three resulting entities "would be improper and unfair." Tyco's counsel added that Tyco did "not think that securities plaintiffs have any legitimate reason to object to the sharing arrangement that Tyco intends to adopt."

38.    In addition to clearly depriving Plaintiffs of a claim against all Tyco assets as is now the case, to date, Tyco's attorneys have declined to provide Plaintiffs with any specific information whatsoever regarding the planned "arrangement for proportionate sharing of liability."

**E.    THE CLASS WILL SUFFER HARM IN THE ABSENCE OF RELIEF**

39.    At present, the Class has a claim for joint and several liability on all of the assets of Tyco. Under proportionate liability, the Class would be required to seek a portion of any judgment from each of the entities and if a particular entity could not satisfy its portion, the Class would not have recourse against the remaining companies for that unsatisfied portion.

40.    Tyco's actions demonstrate that the Company's dissipation of assets through the proposed split has been carefully calculated to delay and/or defeat the Class' ability to collect by forcing the Class to pursue three distinct parties pursuant to some artificial (and currently undisclosed) formula – without knowing whether any or all of those three entities will have, at any point in time, assets sufficient to satisfy the percentage of liability that is to be allocated to them under the so-called "sharing agreement"/"sharing arrangement."

41.    In order to (a) preserve the efficacy of a future monetary remedy in favor of the Class (in view of the Class' clear right to recover for the violation of federally protected rights under both the Securities Act of 1933 and the Securities Exchange Act of 1934) and (b) preserve the status quo as it existed prior to the Company's January 13, 2006 announcement of the

proposed Split Up Plan, the Class is entitled to injunctive and/or appropriate equitable or

declaratory relief as set forth in this Complaint.

## CLAIMS FOR RELIEF

### COUNT I

**(For Violation of the Uniform Fraudulent Transfer Act,
N.H. Rev. Stat. § 545-A:1, *et seq*.)**

42.      Plaintiffs incorporate by reference each of the preceding paragraphs of this

Complaint as if set forth fully herein.

43.      This Count is for equitable relief pursuant to the Uniform Fraudulent Transfer

Act, N.H. Rev. Stat § 545-A:1, *et seq*.  Under the Uniform Fraudulent Transfer Act, it is

unlawful for a debtor to transfer its assets to a third party (or to incur an obligation as to those

assets) with the intent to hinder or delay creditors from reaching those assets to satisfy their

claims.  It is similarly unlawful for a debtor to transfer its assets to a third party (or to incur an

obligation as to those assets) without receiving a reasonably equivalent value in exchange for the

transfer or obligation, when either: (i) the debtor was  engaged or about to engage in a business

or a transaction for which the remaining assets of the debtor were unreasonably small in relation

to the business or transaction; or (ii) the debtor intended to incur, or believed or reasonably

should have believed that it would incur, debts beyond its ability to pay as they became due.

44.      As set forth in the Securities Complaint pending before this Court, the Class is the

holder of certain federal securities law claims against Tyco.  Those federal securities law claims

are "claims" for purposes of the Uniform Fraudulent Transfer Act, N.H. Rev. Stat. § 545-

A:1(III).  Moreover, the Class is a "creditor" (and Tyco is a "debtor") for purposes of the

Uniform Fraudulent Transfer Act, N.H. Rev. Stat. § 545-A:1(IV),(VI).

45.     On January 13, 2006, Tyco announced that its Board of Directors had approved the proposed Split Up Plan.  The net result of the proposed transaction is that instead of one company (Tyco) with 2005 revenues of approximately $40 billion, there would now be three separate (and independent) companies as follows: (1) Tyco Healthcare (with 2005 revenues of nearly $10 billion); (2) Tyco Electronics (with 2005 revenues of $12 billion); and (3) Tyco Fire & Security (with 2005 revenues of $18 billion) (the "Resultant Companies").

46.     To date, Tyco has refused to provide Plaintiffs with any specific information regarding its planned "arrangement for proportionate sharing of liability" and the effect of the proposed Split Up Plan on Tyco's ability to satisfy its liability obligations vis-à-vis the Securities Action.  Tyco has flatly rejected Plaintiffs' request that any proposed plan to Split Up Plan Tyco provide for joint and several liability among the Resultant Companies and has failed to provide Plaintiffs with any other reasonable assurances that it will take (or has taken) steps to ensure that the ability of Class members in the Securities Action to satisfy an award of damages will not be compromised by the proposed reorganization.  Tyco's actions in this regard demonstrate that the Company's proposed transfer of assets through the Split Up Plan has been carefully calculated and orchestrated to hinder, delay and/or defeat the Class' ability to collect damages owed to it due to the egregious violations of the federal securities laws that are the subject of the Securities Action.

47.     At present, the Class has a claim for joint and several liability on all of the assets of Tyco.  Tyco clearly intends to structure the Split Up Plan so that each of the Resultant Companies will have liability only for some portion of any recovery in the Securities Action. Under proportionate liability, the Class would be required to seek a portion of any judgment

from each of the entities and if a particular entity could not satisfy its portion, the Class would not have recourse against the remaining companies for that unsatisfied portion.

48.     In view of all of the surrounding facts and circumstances, including Tyco's stated refusal to provide for joint and several liability among the Resultant Companies as well as its failure to provide Plaintiffs with any specific information regarding the proposed allocation of liability or to otherwise provide Plaintiffs with adequate assurances regarding the Class's ability to satisfy a judgment in the Securities Action, it is clear that the proposed transfer of assets by Tyco is intended to hinder and delay the rights of creditors and constitutes a violation of Uniform Fraudulent Transfer Act, N.H. Rev. Stat. § 545-A:4.

49.     Additionally, the proposed transfer of assets by Tyco constitutes a violation of Uniform Fraudulent Transfer Act, N.H. Rev. Stat. § 545-A:4(I)(b)(1) because it constitutes a transfer of assets to a third party without receiving a reasonably equivalent value in exchange for the transfer and the remaining assets owned by the Resultant Entities would be unreasonably small, in light of Tyco's enormous potential liability in the Securities Action.

50.     As set forth above, Tyco's decision to effectuate the Split Up Plan – coupled with its stated refusal to incorporate a provision for joint and several liability among the resulting entities, and its failure to provide Plaintiffs with any other appropriate agreement, undertaking or other assurance that the Class' right of recovery will not be materially altered, curtailed, or otherwise hindered thereby – will have the effect of delaying, hindering, impeding, and perhaps defeating, the Class' ability to recover on account of Tyco's numerous violations of the federal securities laws.

51.     The Class will be irreparably harmed by the Split Up Plan in the absence of an appropriate agreement, undertaking or other assurance from Tyco that the Class' right of

recovery will not be materially impeded, altered, curtailed, or otherwise hindered thereby.

Accordingly, this Court should, pursuant to the Uniform Fraudulent Transfer Act, N.H. Rev.

Stat. § 545-A:7(I)(c),  permanently enjoin Tyco, and all persons acting on its behalf or in concert

with it, from taking any action, either directly or indirectly, in furtherance of the proposed Split

Up Plan (and require Tyco to maintain the status quo as it existed prior to January 13, 2006),

unless and until Tyco provides an adequate agreement, undertaking or other assurance that the

Class' right of recovery in the Securities Action will not be materially altered, curtailed, delayed

or otherwise hindered by the Split Up Plan.  Alternatively, the Court should, in equity and

fairness,  impose a constructive trust on the assets of the Resultant Companies in favor of the

Class in the Securities Action.

## COUNT II

### (For Unjust Enrichment)

52.     Plaintiffs incorporate by reference each of the preceding paragraphs of this

Complaint as if set forth fully herein.

53.     On January 13, 2006, Tyco announced that its Board of Directors had approved a

plan to separate the Company's current portfolio of businesses into three separate, publicly

traded companies – Tyco Healthcare; Tyco Electronics; and the combination of Tyco Fire &

Security and Engineered Products & Services.  In that connection, the Company announced that

(a) it intended to accomplish the separation through tax-free stock dividends to Tyco

shareholders, after which they will own 100% of the equity in three publicly traded companies

and (b) each resultant company will have its own independent Board of Directors.  As stated

during Tyco's January 13 conference call:  "[i]t's important to point out that ***the proposed***

***transaction is nothing more than dividing the existing Tyco into three, more focused entities,***

***which will be given to shareholders*** in the form of tax-free stock dividends." (emphasis supplied).

54.     It is clear that in the absence of a corporate reorganization as contemplated by the proposed Split Up Plan, any recovery obtained by the Class on account of Tyco's violations of the federal securities laws in the Securities Action can be satisfied by resort to the entirety of Tyco's assets. Thus, at present, each of the holders of Tyco common stock own a proportional interest in Tyco's assets subject to 100% of the potential liability for claims asserted in the Securities Action.

55.     However, as set forth herein, Tyco has made clear, both in public disclosures and correspondence with Plaintiffs, that it plans to structure the Split Up Plan so that each of the Resultant Companies will only have liability for some portion of the Class' recovery in the Securities Action "allocated appropriately" by Tyco. Under the scheme of proportionate liability proposed by Tyco, members of the Class would be required to seek separate portions of any recovery from each of the Resultant Companies and if any individual Resultant Company could not satisfy its portion, the Class would have no recourse against the remaining Resultant Companies for that unsatisfied portion.

56.     To the extent that (a) the Split Up Plan actually is consummated and (b) each of the Resultant Companies will have liability only for some limited portion of any recovery by the Class in the Securities Action, each of the Resultant Companies (and its or their shareholders) will be unduly and unjustly enriched because they will have been given interests in the Resulting Companies whose assets are in each case subject only to a limited portion of the potential liability for claims in the Securities Action.

57.     In view of that undue and unjust enrichment, this Court should, in equity and fairness, impose a constructive trust on the assets of the Resultant Companies in favor of the Class in the Securities Action.  Alternatively, the Court should permanently enjoin Tyco, and all persons acting on its behalf or in concert with it, from taking any action, either directly or indirectly, in furtherance of the proposed Split Up Plan (and require Tyco to maintain the status quo as it existed prior to January 13, 2006), unless and until Tyco provides an adequate agreement, undertaking or other assurance that the Class' right of recovery in the Securities Action will not be materially altered, curtailed, delayed or otherwise hindered by the Split Up Plan.

## COUNT III

### (For a Declaratory Judgment, 28 U.S.C. § 2201)

58.     Plaintiffs incorporate by reference each of the preceding paragraphs of this Complaint as if set forth fully herein.

59.     On January 13, 2006, Tyco announced that its Board of Directors had approved a plan to separate the Company's current portfolio of businesses into three separate, publicly traded companies – Tyco Healthcare; Tyco Electronics; and the combination of Tyco Fire & Security and Engineered Products & Services.

60.     In the absence of a corporate reorganization as contemplated by the proposed Split Up Plan, any recovery obtained by the Class on account of Tyco's violations of the federal securities laws in the Securities Action can be satisfied by resort to the entirety of Tyco's assets.

61.     However, as set forth herein, Tyco has made clear, both in public disclosures and correspondence with Plaintiffs, that it plans to structure the Split Up Plan so that each of the

Resultant Companies will only have liability for some portion of the Class' recovery in the Securities Action "allocated appropriately" by Tyco.

62.    To the extent that (a) the Split Up Plan actually is consummated and (b) each of the Resultant Companies will have liability only for some limited portion of any recovery by the Class in the Securities Action, the members of the Class will have their ability to fully satisfy a judgment against Tyco impaired as a result of the Split Up Plan since the inability of one of the resulting entities to pay its portion of any judgment will cause the Class to lose the ability to recovery that unpaid portion.  At present, the Class could seek recovery from all portions of Tyco, without limitation.

63.    In order to preserve the right of the Class to satisfy any judgment rendered against Tyco (and to prevent Tyco from unfairly taking steps to materially alter, curtail, delay or otherwise hinder the Class' right of recovery in the Securities Action), this Court should, in equity and fairness, declare, pursuant to the authority granted by 28 U.S.C. § 2201, that the Resultant Companies shall be jointly and severally liable for any damages owed the Class due to the violations of the federal securities laws that are the subject of the Securities Action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray judgment as follows:

A.    That a permanent injunction be issued against Tyco preventing, restraining and enjoining Tyco, and all persons acting on its behalf or in concert with it, from taking any action, either directly or indirectly, in furtherance of the proposed Split Up Plan (and requiring Tyco to maintain the status quo as it existed as of January 13, 2006), unless and until Tyco provides an adequate agreement, undertaking or other assurance that the Class' right of recovery in the

Securities Action will not be materially altered, curtailed, delayed or otherwise hindered as a result of the proposed Split Up Plan.

B.      In the alternative, that this Court either (a) impose a constructive trust such that any assets distributed by Tyco to the Resultant Companies through the Split Up Plan be held by those companies in constructive trust for the benefit of the Class in the Securities Action or (b) declare that the Resultant Companies shall be jointly and severally liable for any damages owed the Class due to the violations of the federal securities laws that are the subject of the Securities Action.

C.      That Plaintiffs be awarded their costs and disbursements of this suit, including reasonable attorneys' fees, accountants' fees and expert fees; and

D.      That Plaintiffs have such other and further relief as the Court deems just and proper.

Dated:  February 14, 2006                       Respectfully submitted,

                                                ORR & RENO, P.A.

                                                /s/ William L. Chapman
                                                William L. Chapman (N.H. Bar No. 397)
                                                One Eagle Square, P.O. Box 3550
                                                Concord, NH 03302-3550
                                                Telephone: (603) 224-2381
                                                Fax: (603) 224-2318
                                                *Local Counsel for the Securities Action Plaintiffs*

| | | |
|---|---|---|
| Jay W. Eisenhofer | Melvyn I. Weiss | Richard S. Schiffrin |
| Geoffrey C. Jarvis | Sanford P. Dumain | Katharine M. Ryan |
| Sidney S. Liebesman | Paul D. Young | Michael K. Yarnoff |
| GRANT & EISENHOFER P.A. | MILBERG WEISS BERSHAD & | SCHIFFRIN & |
| 1201 North Market Street, | SCHULMAN LLP | BARROWAY, LLP |
| Suite 2100 | One Pennsylvania Plaza | 280 King of Prussia Road |
| Wilmington, DE 19801-1165 | New York, NY 10119 | Radnor, PA 19087 |
| Telephone: (302) 622-7000 | Telephone: (212) 594-5300 | Telephone: (610) 667-7706 |

*Co-Lead Counsel for the Securities Action Plaintiffs*